**LIFE FORMS, INC., Appellant/Cross–Appellee,**

v.

**THE WOODLANDS OPERATING COMPANY, L.P., and The Woodlands Land Development Company, L.P., Appellees/Cross–Appellants.**

No. 09–09–00091–CV.

Court of Appeals of Texas, Beaumont.

Submitted Sept. 17, 2009.

Decided Jan. 14, 2010.

592

Thomas M. Farrell, Paul D. Flack, So-
lace K. Southwick, Nickens Keeton Law-

less Farrell & Flack LLP, Houston, for appellant.

Karen D. Smith, Rachael M. Rolon, Kirby D. Hopkins, Drucker, Rutledge & Smith, L.L.P., The Woodlands, for appellees.

Before McKEITHEN, C.J., GAULTNEY and HORTON, JJ.

## OPINION

STEVE McKEITHEN, Chief Justice.

In this appeal, we must determine whether the defendants conclusively established their limitations defense. The appellant contends the trial court erred: (1) in entering summary judgment in the face of unrefuted evidence of fraudulent concealment; (2) in determining that the appellant's fraud claims accrued more than four years before the suit was filed; and (3) in failing to grant a continuance and reconsider the motion for summary judgment after additional discovery. In a cross-appeal, the appellees contend that the trial court erred in denying a second combined traditional and no-evidence motion for summary judgment concerning claims for fraud in connection with transactions that occurred within four years of suit.

On September 18, 2006, Life Forms, Inc. ("Life Forms"), a production home builder, filed a fraud suit against real estate developers, The Woodlands Operating Company, L.P., and The Woodlands Land Development Company, L.P. (collectively "The Woodlands").[1] Life Forms alleged that it purchased lots in reliance upon The Woodlands' false representations that all production homebuilders pay the same prices for the same types of lots. The Woodlands sought a partial summary judgment on the grounds that Life Forms's fraud claim accrued more than four years before it filed suit. In response, Life Forms argued that The Woodlands' fraudulent concealment of the difference in prices paid by Life Forms and other production builders tolled limitations. The trial court denied The Woodlands' separate motion for final summary judgment that challenged each element of Life Forms's fraud claim. After the trial court granted The Woodlands' motion for partial summary judgment on grounds of limitations, Life Forms nonsuited all of its claims that had not been disposed of in the partial summary judgment. The trial court severed a counterclaim filed against Life Forms by The Woodlands, and this appeal followed.

"In conducting our review [of a summary judgment], we take as true all evidence favorable to the nonmovant, and we make all reasonable inferences in the nonmovant's favor." *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex.1999). Defendants moving for a traditional summary judgment on the affirmative defense of limitations must conclusively establish when the cause of action accrued. *Id.* "Generally, in a case of fraud the statute of limitations does not commence to run until the fraud is discovered or until it might have been discovered by the exercise of reasonable diligence." *Little v. Smith*, 943 S.W.2d 414, 420 (Tex.1997). Fraudulent concealment estops a defendant from relying on limitations as an affirmative defense. *Borderlon v. Peck*, 661 S.W.2d 907, 908 (Tex.1983); *Nichols v. Smith*, 507 S.W.2d 518, 519 (Tex.1974) ("When the

---

1. Life Forms filed its original petition on September 18, 2006. It filed an amended original petition on October 16, 2006, and The Woodlands filed its original answer to the amended petition on November 1, 2006. From this record, we cannot determine whether the original petition was served on the defendants.

defendant is under a duty to make a disclosure but fraudulently conceals the existence of a cause of action from the one to whom it belongs, the guilty party will be estopped from relying on the defense of limitations until the right of action is, or in the exercise of reasonable diligence should be, discovered."). "The estoppel effect of fraudulent concealment ends when a party learns of facts, conditions, or circumstances which would cause a reasonably prudent person to make inquiry, which, if pursued, would lead to discovery of the concealed cause of action." *Borderlon,* 661 S.W.2d at 909. The party asserting fraudulent concealment as an affirmative defense to the statute of limitations has the burden to raise it in response to the summary judgment motion and to present summary judgment evidence that raises a fact issue on each element of the fraudulent concealment defense. *KPMG Peat Marwick,* 988 S.W.2d at 749.

In this case, Life Forms alleged: (1) that it built approximately 3,000 homes in over thirty-five communities in The Woodlands; (2) that throughout their relationship The Woodlands made consistent representations regarding their lot pricing practices; and (3) that Life Forms now knows that the repeated representations were false. Life Forms contends it discovered the lot prices paid by its competitors in a meeting held September 26, 2002, and argues its cause of action accrued no earlier than that date. Thus, Life Forms sued for an on-going fraud it allegedly discovered on September 26, 2002.

Most of the communications in the record were between either Scott Mitchell or Mark Alvis on behalf of Life Forms, and Roger Galatas, Tim Welbes, or Virgil Yoakum for The Woodlands. On May 1, 1991, Mitchell wrote to Galatas after a meeting about square foot maximums and lot pricing in Lake Pointe and Cochran's Green

subdivisions. Mitchell explained that he tabulated all first quarter sales from the monthly residential sales report and arrived at approximate lot prices for the sales. Mitchell suggested comparing Life Forms's lot programs to other production programs and stated that "[a]t 17.5% [of list price] we would be paying more than Village and Weekley for the same size lot and same location. Would this work for everyone?" According to Mitchell, "This will be the first time in several years we will pay more for MH–P [Medium High–Production] lots than other production builders." In a response dated May 9, 1991, Welbes agreed to amend their existing contracts to what was apparently 17.5% of list price, a figure Mitchell stated would result in Life Forms paying more for its lots than the other builders mentioned in his correspondence.

An affidavit by Alvis states that in early 1992 "Life Forms became concerned that The Woodlands might be charging Life Forms more than it was charging other builders for comparable lots." On March 11, 1992, Mitchell sent a memorandum to Welbes. Mitchell stated that "[a]pparently there has been tiered lot prices for MH–P and MH–C [Medium High Custom] except for Life Forms lots since last June 1, 1991." Mitchell complained that Life Forms had not received complete historical information and noted that the escalators for other builders appeared to be inconsistent with those of Life Forms. The memorandum compares lot prices for Life Forms with those for two other builders and claims there is a $3,500 approximate difference between the two program tiers. The memorandum suggests a credit be applied to compensate Life Forms for the difference.

In a memorandum to Welbes dated April 3, 1992, Mitchell proposed lot prices for a particular section in development.

Included in the proposal were lot prices for Life Forms's competitors and "back credit" of $49,000, representing $3,500 each for fourteen lots built at 3200 square feet or less under a May 30, 1991, contract.

On April 23, 1992, Galatas wrote to Mitchell. In this letter, Galatas stated that "[o]ur pricing policy as it affects Life Forms is to be governed by two principal considerations:

- First, we will continue to use our best efforts to deal fairly with Life Forms and all other builders in The Woodlands, while maintaining the pricing control necessary to generate profits for TWC. This means that pricing will normally be the same for all builders wishing to purchase lots within an identified lot category. Of course, pricing differences may occur because of locational advantages, amenities associated with a particular neighborhood, supply of lots, demand for homes, special housing programs, the desire to dispose of distressed or isolated lots and other special marketing factors. Again, however, fairness means that, absent such unusual circumstances, we will continue our best efforts to treat all builders equitably.
- Second, because of the relationship between you and now Kent as owners of Life Forms and your father as the principal stockholder and officer of MEDC [Mitchell Energy & Development Corporation], it is especially important that TWC not give Life Forms any special advantage in lot pricing or in any other matter.

The letter states that the company had reviewed its pricing of all lots sold during 1991 in the Village of Cochrans Crossing and stated that "it is our opinion that lot pricing has been substantially the same for all builders in each identified lot category. This is true whether the comparison is made using the price of the average lot per square foot or a lot price ratio measurement." Galatas states that The Woodlands cannot give Life Forms a retroactive downward adjustment, but goes on to state that "to the extent that there may have been confusion over lot pricing and standards, particularly during 1991, we offer the attached check in the amount of $49,000 to compromise and settle all differences between our two companies."

For 1992, the letter states that The Woodlands would charge Life Forms, Village, and Weekley $33,570 for lots with less than 3,200 square foot homes and $37,460 for 3,200 to 3,400 square foot homes. Galatas states that "[s]ubstantially, identical contracts will be signed by Weekley and Village; and the same terms are in the Life Forms contract which has been submitted to you." In the letter, The Woodlands refuses Mitchell's request "for rather extensive information concerning historical business transactions with other builders[.]"

In his summary judgment affidavit, Alvis says that Life Forms relied on these assurances and continued to buy lots in The Woodlands. According to Alvis, in the years that followed, Life Forms met and corresponded with the developer "countless times to discuss lot pricing and building criteria." Life Forms proposed building criteria and pricing for various development programs in The Woodlands, "but always with the understanding that the terms of those programs would be the same for all builders." Alvis repeatedly confirmed "that Life Forms was paying the same prices as other builders for similar lots."

On June 4, 1992, Life Forms complained to Welbes about having had one of its plans rejected for exceeding the contractual square footage. In the letter, Mitchell reminded Welbes to check on two 2,952

square foot houses built by a competitor on lots for a 2,800 square foot program. In the letter, Mitchell noted that he had provided addresses of competitor-built houses that exceeded the size limit. He stated, "What is ironic about this issue is the growing misconception that Life Forms has unfair advantage while we have traditionally paid more for same size lots and same square footage while other builders take advantage of TWC's lack of command for the facts or enforcement." This letter demonstrates that in 1992, after being told that The Woodlands would treat all builders equitably on lot prices, Life Forms was aware that it was paying more for its lots than its competitors were paying, and that it was not receiving the benefit of its premium because The Woodlands allowed Life Forms's competitors to do for free what Life Forms had paid to do.

In a letter to Galatas, also dated June 4, 1992, Mitchell stated that, "based on information procured from both inside and outside of TWC, it is our understanding that LFI has been paying *more* for lots than other production builders on comparable lots. The $49,000 retribution check included in your letter reflecting the recent confusion over the two-price tier for medium-high lots seems to confirm this." Mitchell also stated that "[u]pon my discovery on March 6, 1992 of the two-price tier pricing scheme offered other production builders since September 1991, I was *not yet aware* that this advantage was offered to *custom* builders as well. What this essentially means was that the Life Forms' high tier (the only price for Life Forms) was *equal in price* to the lower price tier available to custom builders for the same size lot. Thus, since other production builders chose not to pay high tier, LFI paid at least $3,500 more than production builders and often the same as custom builders for the same size lot." The letter suggests that The Woodlands make lot pricing information available to all builders.

On November 23, 1993, Alvis wrote to Welbes about raising the maximum square footage limit in Haydens Run. Alvis suggested lowering the land to sales price ratios, and stated that "[a]veraging the sales prices for Village, Weekley and LFI Medium Programs for July through October of this year yields land to sales price ratios ranging from 19.5% to 21%." Alvis also stated that "I've reviewed the 'Standard Sales Price' sheets for Village, Weekley and LFI, and found that with the exception of several one-story plans, there is nothing available in any MH(P) neighborhood in the 180's."

In a letter to Galatas dated September 7, 1995, Mitchell complained that the lot pricing policy had been discussed "many times in the past" and complains that "decisions made by The Woodlands Corporation in regards to the Medium lot program led to conditions that imposed a tremendous strain on our sales which led to a severe financial burden for Life Forms. The fact that we have not been able to discuss this issue leaves Life Forms vulnerable to its reoccurrence."

In 1996, Life Forms proposed that The Woodlands allow Life Forms to "exercise its strengths" as follows: "1. Smaller lots than competitors of same price range homes[;] 2. Same square footage as competitors[;] 3. Same coverage ratio as competitors[; and] 4. Accept a reasonable lot price premium." Life Forms stated that its past experiences included "Life Forms purchases the same size lot with the same development criteria at a higher price than our giant competitors" and "Life Forms purchases the same size lot with the same development criteria at the same price as our giant competitors." Life Forms proposed that to have an opportunity for profitability in The Woodlands "Life Forms

purchases smaller lot with the same development criteria at a lower price than our giant competitors."

Alvis drafted a letter of understanding that was discussed in a meeting but never executed. The proposed letter of understanding stated that The Woodlands would offer to Life Forms lots of a smaller size than other homebuilders, that The Woodlands would apply the same development criteria with respect to home square footage and coverage ratios, and that the pricing of Life Forms's lots would be approximately proportionate on a square footage basis with the pricing of the larger lots sold to other builders. Alvis's proposed letter of understanding also emphasized that it was non-binding and subject to change at any time. A memorandum dated March 17, 1997, from Welbes to Galatas concerned a meeting with Scott Mitchell, Alvis, George Mitchell, and Alan Vitale about a proposal for the letter of understanding. In the internal memorandum to Galatas, Welbes noted that "language which calls for 'smaller lots than the competition' appears to me to mean that the lots, terms/conditions for an LFI neighborhood would *have to exclude* their 'competition'. LFI differs with me on this point."

On June 27, 1997, Alvis wrote to Welbes with a proposal for developing homes for young families. On October 7, 1997, Alvis wrote to Welbes and proposed developing another section for what he referred to as Low and Medium Low programs. The attached proposal suggested the lot prices and development criteria that would apply to the development.

Alvis's summary judgment affidavit states that on September 26, 2002, he attended a meeting with Yoakum to discuss Life Forms's active development projects. During the meeting, Yoakum "shared with me lot pricing information for some of Life Forms's competitors' comparable projects." According to Alvis, until that time The Woodlands had always refused to provide Life Forms with the prices other builders paid and "said instead that all builders were paying the same for comparable lots with similar development criteria." Alvis states that "[i]n the months after the meeting in September 2002, I discovered that Life Forms was paying significantly higher prices under its current contracts than its competitors." In his affidavit, Alvis does not state how he discovered this information.

In his deposition, Alvis testified that after the September 26 meeting, "I did an evaluation of the lot sizes in both communities as a comparison, I did an analysis of the development criteria, and I also, I think, produced what—what—basically what the sales prices were that the product was being offered." Alvis obtained the home sale prices off a document he already had in his possession called a "new home sales report." He also used "base prices" he also had in his possession. Alvis stated that he may have checked the Queenscliff brochure. By checking the competitors' sales brochures, Alvis determined that "they were being permitted to build larger homes than us[.]" Alvis had a printout of all the lots, blocks, and sections that also revealed the square footage of each lot. He also contacted an engineer who provided lot sizes for a particular section. The one piece of information Alvis did not have prior to the meeting was "[t]he 39,140–dollar price and the 42,720–dollar price."

In a letter dated October 23, 2002, Alvis discussed lot price adjustments for Summerlyn Lane and Summerlyn Waye with Virgil Yoakum. Using Queenscliff as the comparative product, Alvis "took the lot prices for both 'under 1900' and 'under 2300' sq. ft. tiers in Queenscliff and divided them by the average lot size (7974 sq. ft.) in Queenscliff and arrived at $4.98 and

$5.36 per sq. ft. of land, respectively."[2] The average land value for Summerlyn Lane was $29,621 for under 1,900 square foot homes and $31,881 for under 2,300 square foot homes. Alvis then assumed a locational value to the customer for Queenscliff and reduced Life Forms's cost by $4,000. For Summerlyn Waye, Alvis compared the lot prices for the under 2,900 square foot tier in Hawthorne Hollow, then took the average size lot in Summerlyn Waye for a yield of $40,944 for under 2,900 square foot homes and $43,768 for under 3,100 square foot homes. Alvis reduced Life Forms's lot price by $4,000 for location. For both sections, Alvis suggested that "[a]n additional (lower) pricing tier for this plan would be very helpful in this effort."

A letter from Alvis to Welbes dated November 27, 2002, stated that "if you stand further back to get a broader perspective, 26 years broad, I believe it is clear that the many changes we have fought for, whether it has been higher square footage in all programs, ... or higher densities, ... have proven to not only benefit Life Forms, but have also benefitted other builders and TWC/TWOC equally so." Alvis states:

I can honestly say that at no time during my tenure at Life Forms have we ever attempted to seek, in any way, an unfair competitive advantage over the competition. Nor have we ever attempted to slight TWC/TWOC with our proposed changes. The present issues related to lot pricing are no different. If we cannot figure out a way for us to get our lot pricing in any of our Family Projects underway to prescribe to the methods we have previously agreed to, chances are that the project(s) will not make economic sense for us to continue. I am all too familiar with the experience LFI had in Haydens Run. I have no interest in bleeding over the same ground.

In a document also dated November 27, 2002, but referring to the time period from 1987 to 1994, Life Forms stated:

[W]e discovered that this additional $10,000 premium was actually paid by Life Forms to TWC for nothing, as competing builders (Ryland, Pulte, Emerald, and Village) were given the same square footage limits in this section of VOAB, absent the premium lot price. In effect, LFI found itself paying $10,000 more for the same size lot with the same home size limits as its competition and was forced into losing a substantial amount of money as we struggled thr[o]ugh the last 80 sales in Haydens Run.

In this document, Life Forms stated its market approach from 1995 to the present was to purchase a smaller lot than competing builders, build the same size home, and charge the same amount of money. According to Life Forms, "In order for this approach to work, it was and remains necessary to price Life Forms' lots in a fair and equitable way as it relates to our competitor's lot pricing." Life Forms described the following lot pricing formula: "1.) Locate most likely competitor(s) in terms of home size & home price[;] 2.) Calculate the $/sq. ft. of land price of the competitor's lots[;] 3.) Multiply this $/sq. ft. number by the average lot size of LFI community[;] 4.) Adjust for any locational/amenity differences (if any)[; and] 5.) Adjust for small variances, if any, in home size limits/tiers."

In deposition Alvis testified that the "present lot price inequities" in November 2002 were the same issues Mitchell had raised in September 1995 "so much as inequity lot pricing[.]" Alvis was asked to

2. The products of these figures are $39,710.52 and $42,740.64.

identify with specificity which projects he believed to have been involved in "lot pricing inequities." Alvis mentioned the Lake Pointe, Haydens Run, Summerlyn Waye, and Summerlyn Lane projects. According to Alvis, "We were suspicious of this going on in the mid '90s with the Haydens Run project, but we never did confirm anything with that." Next, he referred to three projects started in the mid–1990's. Asked about the reference to a "$10,000 premium," and whether that statement indicated "that in the 1987 to 1994 time period, Life Forms had actually discovered that it was paying this premium that no one else was paying," he responded, "That was just a guess on my part. I had no—I had no facts to back any of that up."

According to Alvis, Welbes shared lot pricing information regarding Shell Creek, Davis Park, Arvis Grove, and Pepperdale on December 18, 2002. By then, according to Alvis, Life Forms had "already confirmed that there was lot price inequity" and what they were doing was "calibrating it."

An affidavit by R. Kent Dussair, president of CDS Market Research, states that "[f]or the past 30 years, CDS Market Research, *Community Development Strategies,* has provided Houston's land development and home building communities with a source of dependable information relating to planning and negotiating lot pricing." According to the affiant, the publication "is the industry standard for current and accurate data describing lot pricing and lot availability for all sizes, types and locations of single family development in the Greater Houston Region, including The Woodlands." To his knowledge, Life Forms never purchased the publication. In an affidavit submitted in response to the motion for summary judgment, Alvis states that this publication is "far too vague, averaged, and generalized to have

put Life Forms on notice that TWLDC was charging other builders lower prices for comparable lots."

■■ Life Forms argues that the summary judgment evidence shows only that it repeatedly inquired regarding the fairness of The Woodlands' lot pricing and received false reassurances upon which it relied. Some of the communications include a request for specific information regarding the prices paid for lots by competitors of Life Forms. The Woodlands refused to provide Life Forms with the specific sales prices paid by other builders. Once obtained by Life Forms, the previously withheld information provided Life Forms with evidence necessary to prove Life Forms's allegations that The Woodlands' falsely represented to Life Forms that all production homebuilders pay the same prices for the same types of lots. Regardless of when it obtained evidence of fraud, however, the estoppel effect of any fraudulent concealment by The Woodlands ended when Life Forms learned that The Woodlands' lot pricing programs were being applied contrary to The Woodlands' representations and in a manner that caused economic injury to Life Forms. *See KPMG Peat Marwick,* 988 S.W.2d at 749 (accrual for limitations purposes occurs when plaintiff is aware of its injury and that its injury was caused by the wrongful conduct of another); *Borderlon,* 661 S.W.2d at 909 ("Knowledge of such facts is in law equivalent to knowledge of the cause of action."). "Texas law has never required that a plaintiff know all the essential facts before a cause of action exists. To the contrary, a cause of action accrues for limitations purposes when a claimant learns of an injury, even if the rest of the essential facts are unknown." *In re Jorden,* 249 S.W.3d 416, 422 (Tex.2008)(mandamus proceeding regarding petition for

pre-trial discovery of potential medical malpractice action).

The summary judgment record chronicles a long-standing complaint by Life Forms that The Woodlands was not treating it fairly regarding the purchase price for lots and the building restrictions placed on those lots. The summary judgment record shows that Life Forms was aware that its competitors received what Life Forms regarded as more favorable treatment and Life Forms had determined that favorable treatment placed Life Forms at an economic disadvantage. Assuming for purposes of summary judgment review that The Woodlands falsely represented to Life Forms that Life Forms paid the same prices for lots as its competitors, the summary judgment record conclusively establishes not only that Life Forms was aware of facts, conditions, or circumstances which would cause a reasonably prudent person to make inquiry but also that Life Forms did make such inquiries over a period of many years. The summary judgment record also conclusively establishes that on more than one occasion Life Forms acquired sufficient information for Life Forms to determine the prices paid by its competitors. Although Life Forms submitted summary judgment evidence that it learned the actual prices paid by its competitors on September 26, 2002, there could be no dispute on this record that Life Forms was aware of the disparate treatment it received regarding lot prices and development criteria long before that date. As in its activities after Alvis's meeting with Yoakum, all that Life Forms acquired on September 26, 2002, was information relevant to quantifying its damages for an injury of which it was already aware.

The legal significance of the undisputed facts cannot be ignored. *City of Keller v. Wilson,* 168 S.W.3d 802, 814–17 (Tex.2005)(legal sufficiency of evidence for tolling limitations). Regardless of concealment by The Woodlands, accrual of the cause of action was triggered by Life Forms's actual knowledge that, contrary to The Woodlands' repeated representations of equitable treatment, The Woodlands provided more favorable treatment to the competitors of Life Forms. The summary judgment record conclusively establishes that before September 2002, Life Forms was aware that it was not being treated "equitably," because it repeatedly complained that it was not being treated equitably and sought to change the terms of its agreement with the developer to improve its position. Life Forms's awareness of the fact of lot-pricing inequities could not be erased by repetition of the original assurances. *See Stafford v. Wilkinson,* 157 Tex. 483, 304 S.W.2d 364, 366–67 (1957). "For after actual discovery of the fraud, there can be no further concealment by or reliance upon mere repetitions of the original representation." *Id.* at 367.

The summary judgment record conclusively established that Life Forms was aware of the alleged fraud by The Woodlands before September 2002. We hold that the trial court did not err in granting summary judgment to The Woodlands on the grounds that Life Form's cause of action for fraud accrued more than four years before it filed suit. We overrule issues one and two.

■ In its third issue, Life Forms contends the trial court erred in refusing to continue the summary judgment hearing for additional discovery and in refusing to reconsider the court's summary judgment after some of that evidence was obtained. The Woodlands filed the motion for summary judgment approximately eighteen months after Life Forms filed the lawsuit. Life Forms filed its motion for continuance on April 1, 2008. In its motion for continu-

ance of the submission of the motion for partial summary judgment, Life Forms complained that it had not yet obtained The Woodlands' land database in a form that it could access and utilize effectively. Life Forms explained to the trial court that "Life Forms believes this information will show that, contrary to TWLDC's representations, TWLDC charged Life Forms more than TWLDC charged other builders for comparable lots." Life Forms also expressed its desire to depose Welbes, Galatas, Yoakum, and George Mitchell. According to Life Forms, their testimony would show that Life Forms was repeatedly told that it was being charged the same prices as other home builders for comparable lots.

Life Forms submitted additional summary judgment evidence in a supplemental motion filed on May 14, 2008. The trial court signed the partial summary judgment on September 23, 2008. On October 27, 2008, Life Forms filed a motion to reconsider in which Life Forms alleged that it received the September 23, 2008, order on October 22, 2008. Life Forms did not submit additional summary judgment evidence with this motion. The Woodlands objected, in part because the November 3, 2008, trial setting had been scheduled ever since an agreed docket order was signed on December 11, 2007. On October 27, 2008, the trial court reset the trial setting and allowed four additional depositions to be completed by January 15, 2009. On November 6, 2008, the trial court denied the motion to reconsider the order granting motion for summary judgment. On January 21, 2009, Life Forms filed a motion to reconsider the partial summary judgment in light of deposition testimony and attached affidavits, deposition testimony, and other evidence to the motion. On January 21, 2009, The Woodlands filed an objection and moved to strike on the grounds that notice had not

been timely given. Life Forms supplemented its motion with additional evidence on January 23, 2009. On January 28, 2009, the trial court signed an order that did not sustain The Woodlands' motion to strike but denied Life Forms's motion to reconsider the partial summary judgment.

■ Life Forms argues that the trial court abused its discretion. The nonexclusive factors considered in an appellate review of the denial of a motion for continuance seeking additional time to conduct discovery include: (1) the length of time the case has been on file; (2) the materiality and purpose of the discovery sought; and (3) whether the party seeking the continuance has exercised due diligence to obtain the discovery sought. *Joe v. Two Thirty Nine Joint Venture,* 145 S.W.3d 150, 161 (Tex.2004). The Woodlands filed two motions for summary judgment: (1) a traditional motion for summary judgment based upon limitations; and (2) a combined traditional and no-evidence motion for summary judgment based upon the proof supporting the elements of Life Forms's fraud claim. The trial court granted the former and denied the latter. Accordingly, Life Forms was not harmed by the lack of additional time to conduct discovery on the no-evidence motion for summary judgment.

A party moving for a traditional summary judgment may file the motion at any time. *See* TEX.R. CIV. P. 166a(b); *compare with* TEX.R. CIV. P. 166a(i). In this case, the motion was filed eighteen months after the litigation commenced. The trial court held the motion for approximately six more months before ruling. After the trial court ruled on the motion for partial summary judgment, the court allowed additional discovery and Life Forms submitted additional evidence to the trial court. The trial court did not strike the additional

submission but ruled on Life Forms's motion to reconsider. The trial court granted additional time to obtain evidence and allowed Life Forms to submit that evidence to the trial court.

In its motion for continuance, Life Forms complained that it had not obtained The Woodlands' database in a useable form and argued the database was material to the motion for partial summary judgment because it would show that The Woodlands charged Life Forms more than it charged other builders for comparable lots. The issue in the motion for partial summary judgment was not whether Life Forms was overcharged for lots, but when it learned it had been overcharged and what resources were available to Life Forms. It is undisputed that the database was unavailable to Life Forms before it filed suit. On appeal, Life Forms argues that it identified five depositions it was unable to take effectively because it did not have access to the database.

After granting the motion for partial summary judgment, the trial court granted Life Forms additional time to take four depositions. Life Forms deposed three of the five identified people, then filed a motion to reconsider the summary judgment in light of the deposition testimony. In a supplement to that motion, Life Forms complained that it did not obtain the database in useable form until December 31, 2008, and submitted an affidavit from Alvis as support for Life Forms's argument that it could show an objectively verifiable injury. On January 28, 2009, the trial court signed an order that stated that the trial court had considered the motion, the supplement, the response and the objections, thus affirmatively indicating that it had considered the contents of those documents. *See Auten v. DJ Clark, Inc.,* 209 S.W.3d 695, 702 (Tex.App.–Houston [14th Dist.] 2006, no pet.)(Evidence presented in

a motion for new trial could be considered on appellate review of summary judgment where the trial court indicated it had considered the motion.). Under the circumstances, the trial court did not abuse its discretion. We overrule issue three.

■ Having overruled Life Forms's challenge to the granting of the summary judgment on limitations, we turn to the cross-appeal filed by The Woodlands, which raises two issues: (1) whether the trial court erred in denying the traditional motion for summary judgment alleging there were no fact issues on the materiality and reliance elements of Life Forms's fraud claims; and (2) whether the trial court erred in denying the no-evidence motion for summary judgment alleging there is no evidence that the representations were false, or intended to deceive, or resulted in an injury. After the trial court ordered that Life Forms take nothing against The Woodlands for lots purchased before September 18, 2002, Life Forms non-suited its fraud claim to the extent that the claim related to transactions that occurred within four years of filing suit. Therefore, the partial summary judgment incorporated into the final judgment disposed of all of the claims before the court that had not been severed into a different case.

■ Life Forms concedes that the motions at issue in the cross-appeal present alternate grounds for affirming the summary judgment, but argues the cross-appeal is improper as to the non-suited claims. A party has an absolute right to non-suit, provided that the dismissal cannot prejudice the right of an adverse party "to be heard on a pending claim for affirmative relief. . . ." Tex.R. Civ. P. 162. A pleading that does nothing more than resist the plaintiff's right to recover is not a claim for affirmative relief. *BHP Petroleum Co. v. Millard,* 800 S.W.2d 838, 841

(Tex.1990). The Woodlands' motion for summary judgment sought only to avoid Life Forms's claims and therefore did not concern a pending claim for affirmative relief. *See Tex. Mut. Ins. Co. v. Ledbetter,* 251 S.W.3d 31, 38 (Tex.2008)(quoting *Univ. of Tex. Med. Branch at Galveston v. Estate of Blackmon ex rel. Shultz,* 195 S.W.3d 98, 101 (Tex.2006))("A claim for affirmative relief is one 'on which the claimant could recover compensation or relief even if the plaintiff abandons his cause of action.' "). The combined effect of the trial court's orders was to grant summary judgment on one of several grounds asserted by the defendants. Were we to address the issues raised in the cross-appeal, The Woodlands would not be entitled to greater relief than that granted by the trial court and affirmed by this Court in the appeal by Life Forms. Accordingly, we need not address the issues raised in The Woodland's cross-appeal. We affirm the judgment.

AFFIRMED.